**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------×

XIAMIN ZENG

                *Plaintiff,*

    -against-                             19 CV 03218

THE CITY OF NEW YORK,DETECTIVE DANIELLE      JURY DEMAND
FEBUS[RANK FY20000], INSPECTORJOHN CHELL,
DETECTIVE GARY DENEZZO[RANK FY20000],
SERGEANT GEORGE TAVARES (#5354), POLICE      **SECOND AMENDED**
OFFICER IRWIN LUPERON (SHIELD NO #27763),     **COMPLAINT**
POLICE OFFICER ERLENEWILTSHIRE (SHIELD NO.
#24340),*and*POLICE OFFICER CHRISTOPHER ROBLEY
(#23263), *in both their individual and professional*
*capacities,*

                *Defendants.*
------------------------------------------------------------------------×

       Plaintiff Pro se Xiamin Zeng, alleges for her First Amended Complaint against Defendants

The City of New York (the "City") and Police Detective Danielle Febus ("Detective Febus"), Police

Inspector John Chell ("Inspector Chell"), Police Detective Gary DeNezzo ("Detective DeNezzo"),

Police Sergeant George Tavares ("Sergeant Tavares"), Police Officer Irwin Luperon ("Officer

Luperon"), Police Officer Erlene Wiltshire ("Officer Wiltshire"), and Police Officer Christopher

Robley ("Officer Robley")(all police detectives, inspectors, sergeants, and officers are, collectively,

"Police Officers") (collectively, "Defendants")as follows:

                 **PRELIMINARY STATEMENT**

       1.      The NYPD falsely arrested Ms. Zeng after directing her to report to Queens

Boulevard, saying her son was there.  Once she arrived, Detective Febus and an Administration for

Child Services ("ACS") Case Manager, Mr. Adrianzen questioned Ms. Zeng solely about her

previously filed federal lawsuit against ACS.[1]  After holding her for around seven hours and refusing

to let her see her son or attorney, the NYPD transferred Ms. Zeng to the 75th Precinct.  At the 75th

Precinct, Ms. Zeng continued to be questioned by NYPD Officers, including Inspector John Chell,

---

[1]The suit is *Zeng v. Augustin et al*., 17 CV 9988.

about her ACS lawsuit.  Ms. Zeng was ultimately charged with (i) criminal contempt in the first degree, (ii) criminal contempt in the first degree, (iii) criminal contempt in the second degree, (iv) aggravated harassment in the second degree, and (v) harassment in the second degree for violating a full order of protection issued by Family Court.  All of these charges were dismissed.  At end, Ms. Zeng spent a total of 26 hours under unlawful detention, during which time she sustained substantial physical, emotional, and personal injuries, and was not allowed to see her son, doctor or attorney.

2.      Plaintiff brings this action for compensatory damages pursuant to 42 U.S.C. § 1983 for violations of her civil rights.

## JURISDICTION

3.      This action is brought pursuant to 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments to the United States Constitution, and New York State law. Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343, and 1367.

## NOTICE OF CLAIM

4.      Plaintiff filed a Notice of Claim with the Comptroller of the City of New York within 90 days of the accrual of her claims for false arrest and malicious prosecution. **(See Attached The Notice of Claim)**

5.      More than 30 days have elapsed since the filing of the Notice of Claim, and adjustment or payment thereof has been neglected or refused.

6.      Plaintiff has complied with all conditions precedent necessary to commence an action pursuant to New York State Law.

7.      This action was commenced within one year and ninety days from the date the pendent claims herein accrued.

## VENUE

8.      Venue is properly laid in the Southern District of New York under U.S.C. § 1391(b), in that this is the District in which Plaintiff's claim arose.

## JURY DEMAND

9.     Plaintiff respectfully demands a trial before a jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

10.     Plaintiff Ms. Zeng at all times relevant hereto, was and is a resident of New York County, in the City and State of New York.

11.     Defendant the City was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

12.     The City maintains the New York City Police Department ("NYPD"), a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, The City of New York.

13.     Upon information and belief, at all times relevant hereto, individual Defendant Detective Danielle Febus was a duly sworn member of the NYPD and was acting under the supervision of the NYPD and according to his official duties. Detective Febus is sued herein in his official and individual capacities. At all times hereinafter mentioned, Detective Febus was assigned to the NYPD Queens Child Abuse Squad ("QCAC").

14.     Upon information and belief, at all times relevant hereto, individual Defendant Inspector John Chell was a duly sworn member of the NYPD and was acting under the supervision of the NYPD and according to his official duties. Inspector Chell is sued herein in his official and individual capacities. At all times hereinafter mentioned, Inspector Chell was assigned to the75th Precinct of the NYPD.

15.     Upon information and belief, at all times relevant hereto, individual Defendant Detective Gary DeNezzo was a duly sworn member of the NYPD and was acting under the supervision of the NYPD and according to his official duties.  Detective DeNezzo is sued herein in his official and individual capacities.  At all times hereinafter mentioned, Detective DeNezzo was assigned to the 75th Precinct of the NYPD.

16.     Upon information and belief, at all times relevant hereto, individual Defendant Sergeant George Tavares was a duly sworn member of the NYPD and was acting under the supervision of the NYPD and according to his official duties.  Sergeant Tavares is sued herein in his official and individual capacities.  At all times hereinafter mentioned, Sergeant Tavares was assigned to the 73rd Precinct of the NYPD.

17.     Upon information and belief, at all times relevant hereto, individual Defendant Officer Irwin Luperon was a duly sworn member of the NYPD and was acting under the supervision of the NYPD and according to his official duties.  Officer Luperon is sued herein in his official and individual capacities.  At all times hereinafter mentioned, Officer Luperon was assigned to the 45th Precinct of the NYPD.

18.     Upon information and belief, at all times relevant hereto, individual Defendant Officer Erlene Wiltshire was a duly sworn member of the NYPD and was acting under the supervision of the NYPD and according to his official duties.  Officer Wiltshire is sued herein in his official and individual capacities.  At all times hereinafter mentioned, Officer Wiltshire was assigned to the 75th Precinct of the NYPD.

19.     Upon information and belief, at all times relevant hereto, individual Defendant Officer Christopher Robley was a duly sworn member of the NYPD and was acting under the supervision of the NYPD and according to his official duties.  Officer Robley is sued herein in his official and individual capacities.  At all times hereinafter mentioned, Officer Robley was assigned to the 75th Precinct of the NYPD.

20.     Each and all the acts of the individual Defendants alleged herein were done by them while acting within the scope of their employment by the City.


## STATEMENT OF FACTS

### I. General Facts

21.     On January 8, 2017, Gang Liu, Ms. Zeng's ex-boyfriend and father of her child, posted a rambling blog post in which he accuses Ms. Zeng, among other things, of being a Chinese

spy sent by the Chinese government to come to New York to convert him into a Chinese spy, and, using her connections within the NYPD, having Mr. Liu falsely arrested several times. **(Exhibit A, Blog Post.)**

22. Mr. Liu has a long-documented history of mental illness and is extremely delusional. ("Liu Gang," *Wikipedia* https://en.wikipedia.org/wiki/Liu_Gang.)  Since 2011, a judge declared Mr. Liu mentally unstable, and appointed a custodian guardian to represent him against his wish. ("Liu Gang," *Wikipedia.*)

23. On January 13, 2017, Mr. Liu entered a police precinct and reported to Officer Christopher Robley that Ms. Zeng was Mr. Liu's ex- girlfriend from three years ago; Mr. Liu had a temporary limited family court order of protection; Mr. Liu receive a phone call on a blocked phone number and the voice on the other line allegedly said, in sum and substance, "Give me my camera back or I will kill you."; and Mr. Liu claimed the voice was Ms. Zeng's.

24. On January 14, 2017, Officer Robley activated an ICard for Ms. Zeng's arrest. **(Exhibit B, ICard.)**

25. On December 20, 2017, Ms. Zeng filed a *pro se* federal case in the Southern District of New York against Dana Augustin et al. (17CV9988 (JMF)), related to injuries sustained by the Plaintiff's son during a supervised visitation with his father in the office of an ACS/Child Protective Services ("CPS") social worker.

26. On January 18, 2018, Ms. Zeng contacted the New York State Child Abuse Hotline (the "Hotline") to inquire about the status of her ongoing case.

27. The Hotline provided Ms. Zeng with no information whatsoever.

28. Instead, two ACS employees, under the direction of ACS/CPS Case Manager Diego Adrianzen, visited Ms. Zeng later that night on January 18, 2018.

29. Upon information and belief, the purpose of this visit was to dissuade Ms. Zeng from continuing her suit against ACS.

30. In fact, during this meeting, the ACS employees did not investigate or discuss any potential harm to Ms. Zeng's son.

31.     Between January 19 and January 30, 2018, Mr. Adrianzen and Danielle Febus, an NYPD Detective, threatened and intimidated Ms. Zeng, her neighbors, her son, her son's school associates both at Ms. Zeng's home and at her son's school.

32.     On January 31, 2018, at approximately 10:00 a.m., after dropping her son off at school, Ms. Zeng received a text message saying that her son was in custody at the Queens Child Abuse Squad, **(Exhibit C, Text Message)**, and that Ms. Zeng needed to pick him up.

33.     Immediately upon receiving the text, Ms. Zeng went to pick her son up at 112-15 Queens Boulevard and arrived at approximately 11:00 a.m.

34.     When she arrived, Ms. Zeng was locked in an examination room, where she was told to wait for Detective Febus.

35.     Upon information and belief, Ms. Zeng's son was not there.

36.     Ms. Zeng was confined, waiting for Detective Febus for three hours.

37.     While Ms. Zeng waited, she was attending a personal doctor's appointment.

38.     At approximately 2:00 p.m., Detective Febus and Mr. Adrianzen questioned Ms. Zeng, again, solely about her pending lawsuit.

39.     Upon information and belief, Mr. Adrianzen's and Detective Febus's intention was to question Ms. Zeng and her son at the Queens Child Abuse Squad.

40.     During this investigation, Detective Febus told Ms. Zeng that her lawsuit would require witnesses to come forward, which would cause trouble for them, and, as such, Ms. Zeng should dismiss her suit.

41.     Detective Febus and Mr. Adrianzen also asked Ms. Zeng questions like: "Why are you suing ACS?" "Who helped you file the lawsuit?" "Who is your lawyer?" "Who lives with you?" and "What is your immigration status?"

42.     Detective Febus and Mr. Adrianzen also threatened Ms. Zeng, saying, "If you file this lawsuit, lots of people will get in trouble."

43.     Ms. Zeng refused to answer Detective Febus's and Mr. Adrianzen's answer and repeatedly asked to see her lawyer, doctor, Chinese translator and her son.

44.     Ms. Zeng also asked Detective Febus and Mr. Adrianzen for water, food and using restroom.

45.     Detective Febus and Mr. Adrianzen ignored Ms. Zeng's requests.

46.     At the end of the investigation, Detective Febus forced searched Ms. Zeng and confiscated her cell phone, scarf, and bag.

47.     As Mr. Adrianzen was leaving the investigation room, Ms. Zeng overheard Detective Febus whisper to him, "The Chink doesn't think we can arrest her."

48.     Detective Febus and Mr. Adrianzen left the examination room between 4:00 p.m. and 5:00 p.m.

49.     Ms. Zeng remained confined in the investigation room for one to two hours more.

50.     At about 6:00 p.m., Detective Febus and Officer Wiltshire returned to the locked investigation room.

51.     Detective Febus forced searched Ms. Zeng again and handcuffed her to put her hands behand her back.

52.     Then, without charge or allegations, or without any Miranda warning, Detective Febus and Officer Wiltshire violently dragged and transported Ms. Zeng from Queens Boulevard to the 75th Precinct.

53.     During her relocation, Ms. Zeng repeatedly asked for her lawyer, doctor, Chinese translator and her son.

7

54.     Ms. Zeng also asked to where they were transporting her.

55.     All of Ms. Zeng's inquiries went ignored.

56.     At the 75th Precinct, Ms. Zeng's handcuffs were removed and she was locked in a room with Inspector Chell.

57.     Ms. Zeng complained to Inspector Chell that ACS had trapped her at Queens Boulevard seven hours and that she wanted to see her lawyer, doctor and Chinese translator.

58.     Inspector Chell did not respond to Ms. Zeng's allegations and instead continued to question her as to why she was suing ACS.

59.     Inspector Chell questioned Ms. Zeng for about 20 to 30 minutes.

60.     Inspector Chell never inquired about the welfare of Ms. Zeng's son and when she asked to see her son, Inspector Chell responded, "later."

61.     Inspector Chell then left the room in which Ms. Zeng was held.

62.     Through the glass wall of the room, Ms. Zeng saw Inspector Chell going through her handbag and remove her attorney's business card.

63.     Ms. Zeng said, "You can't take my attorney's business card!"

64.     In response, Inspector Chell said, "I'm not taking it.  I'm only making a copy."

65.     Inspector Chell did not deny that he had taken Ms. Zeng's possession without her consent.

66.     Ms. Zeng said, "You can't do that!" to which Inspector Chell responded, "I can do exactly that."

67.     Inspector Chell took Ms. Zeng's cellphone and said, "Fucking the chink bitch's cellphone password is her birthday or her son's?"

68.     Inspector Chell ignored Ms. Zeng for water, food and using restroom.

69.     Ms. Zeng was then left in the examination room for between 2 to 3 hours.

70.     Between 10:00 p.m. and 11:00 p.m., Inspector Chell returned and forced tight handcuffed to put Ms. Zeng's hands to her back.

71.     Inspector Chell then brought her to a holding cell downstairs in the 75th Precinct.

72.     At this point, Ms. Zeng again asked to see her lawyer, doctor and Chinese translator.

73.     Ms. Zeng also asked whether and why she was being arrested.

74.     Ms. Zeng's request for representation were not granted and her other inquiries were ignored.

75.     Ms. Zeng was then left in this holding cell for about two to three hours.

76.     Police Officers then took Ms. Zeng's fingerprints (and possibly her photograph), at which point she was transported to King's County Criminal Court.

77.     Ms. Zeng was locked in King's County Criminal Court until approximately 6:00 a.m., at which point she met with Public Defender Dara Herbert at the Brooklyn Defender Services.

78.     During his questioning, Inspector Chell never asked Ms. Zeng about Gang Liu,[2] Plaintiff's ex-boyfriend.

79.     Ms. Zeng's "breach of restraining order" involving Mr. Liu was the supposed (though later dismissed) reason for her arrest.

80.     On February 1, 2018, Ms. Zeng was arraigned and released.

_____

[2] Mr. Liu, the complaining witness in *People v. Xiamin Zeng* (Legacy Docket No.: 2018KN005716, Kings Criminal Court) has a long document history of mental illness and is extremely delusional.  For example, Mr. Liu believed Ms. Zeng to be a top Chinese spy and that she worked with the FBI to "launch a war" against him.  He also believes that Ms. Zeng "was sent by the Chinese government to ruin his life and career."

81.     Ms. Zeng was ultimately charged with (i) criminal contempt in the first degree, (ii) criminal contempt in the first degree, (iii) criminal contempt in the second degree, (iv) aggravated harassment in the second degree, and (v) harassment in the second degree for violating a full order of protection issued by Family Court.

82.     Ms. Zeng was confined for 26 hours in total.

83.     Ultimately, all counts against Ms. Zeng were dismissed.

84.     As a result of her false arrest, Ms. Zeng sustained physical injuries, including fever, dizzy spells, and fainting; emotional injuries, including Post Traumatic Stress Disorder ("PTSD"); and personal injuries, including loss of income and inability to work (as a result of PTSD and other afflictions), transportation, administrative, medical, and legal proceedings costs.

85.     During her false arrest, Ms. Zeng's son was removed from her custody for a total of three days, from January 31, 2018 until February 2, 2018, causing both Ms. Zeng and her son severe psychological and emotional damage.

86.     Throughout this process, Ms. Zeng was deprived of seeing her son for days when she had to go to court and win custody back from ACS.

87.     Both Ms. Zeng's false arrest and malicious prosecution claims proceed under the same theory that her arrest was without probable cause. The arrest was illegal because Officer Denezzo cannot rely on the ICard, for the validity of the arrest and Officer Robley did not have sufficient knowledge to form probable cause for Ms. Zeng's arrest.

88.     NYPD investigation card or ICard is an internal NYPD form issued by an officer when there is a suspect, witness, or perpetrator to be investigated. *Johnson v. City of New York*, 15-CV-1625, 2017 WL 1476139, at *2 (E.D.N.Y. April 24, 2017). The NYPD issues ICards to give notice of persons sought for whom there is probable cause for arrest." *Henning v. City of*

*New York,* 09- CV-3998, 2012 WL 2700505, at *1, n.2 (E.D.N.Y. July 5, 2012).  They are not issued by judges and they are not warrants.  They are simply tools for officers to share information as a collective hive mind.

89.    In the ICard activated by Officer Christopher Robley, in the portion labeled "summary of investigation,"—where officers are supposed to describe the facts out of which there is probable case of a crime—simply states: "on January 14, 2017, at approximately 900 hours I activated an I-card on suspect Zeng, Xiamin."  Officer Robley did not do any independent investigation of his own.

90.    "The relevant inquiry [to determine the validity of an arrest is into the information in possession of the arresting officer at the time of the arrest." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).  The "collective knowledge doctrine" allows law enforcement officers are to arrest individuals based on information acquired from materials issued by other law enforcement officers, *United States v. Fleming,* No. 18-CR-197 (KAM), 2019 WL 486073, at *7 (E.D.N.Y. Feb. 6, 2019).  Under the collective or imputed knowledge doctrine, an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation.  *United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001).  The thrust of the doctrine is that it *imputes* knowledge known by another; it does not negate the requirement of probable cause.  It is not a loophole around probable cause.

91.    Under this collective knowledge doctrine, a police officer *may* act reasonably in relying on information from other law enforcement officers, even if she is not personally aware of the facts that provided the probable cause underlying the information she received. *Colon*, 250

F.3d at 135. It does not give an officer *carte blanche* power to make any arrest lawful; it does not negate the judicial oversight that the warrant system has provided for centuries. There is nothing in the ICard from which Officer Denezzo could have had probable cause. There are no facts or circumstances, just the conclusion of probable cause. That is, Officer Denezzo arrested Ms. Zeng solely on a card prepared by Officer Robley saying to arrest. Officers cannot make constitutionally lawful arrests solely on the basis of another officer's conclusory statement that there is probable cause.

92.     Cases where arrests were lawful based on reliance on an ICard involve ICards that include additional information about the facts and circumstances supporting the lawfulness of the arrest, not just the officer's conclusion. For example, in *United States v. Fleming*, a detective entered "a detailed description of an incident which he assessed, in writing, as providing probable cause for an arrest." No. 18-CR-197 (KAM), 2019 WL 486073, at *8 (E.D.N.Y. Feb. 6, 2019). The arresting officer read the assessment and decided to patrol for defendant in connection with the conduct described in the ICard. *Id.* The arresting officer, "working together with other officers from the 73rd Precinct" and relying on the information provided in the ICard, arrested defendant. *Id.*

93.     The case law makes clear that, while an arrest *may* be lawful pursuant to an ICard, an ICard does not make an arrest *per se* lawful. Warrants—which are issued by Judges—do not make an arrest even *per se* lawful, but merely provide a rebuttable presumption. Here, it is simply one officer's word to another that there is a probable cause. There is was no description in the ICard. Relying simply on another officer's conclusion does not end the inquiry. If so, an officer could harass people by issuing an ICard and waiting for another officer to make an arrest without any fear of a Constitutional violation.

Simply put, we do not live in a world where an officer can arrest anyone without consequence based solely on the word of another officer. Our Constitution does not allow such a result.

94.     Next, since Officer Denezzo cannot simply rely on the ICard, the City can only turn to Officer Robley's knowledge to impute on Officer Denezzo.  An arrest in objective reliance on an ICard flyer or bulletin is inadmissible unless the police officer who *issued* the ICard possessed a reasonable suspicion justifying a stop.  *See United States v. Hensley,* 469 U.S. 221(1985) (suppressing evidence).  Here, Officer Robley did not have probable cause.  Officer Robley's ICard was based solely on Mr. Liu's complaint and confirmation that there was an order of protection.  This complaint is flawed for two reasons: first, Mr. Liu identification of Ms. Zeng is insufficient to establish probable cause; and second, Officer Robley's likely knowledge of Mr. Liu's unreliability cancels any probable cause.

95.     The Second Circuit has held where the circumstances call to doubt the victim's veracity, a victim's identification typically insufficient to provide probable cause.  *Stansbury v. Wertman*, 721 F.3d 84, 90 (2d Cir. 2013).  Courts have recognized that where an officer is aware of a "bitter prior relationship" between the alleged victim and the accused, the victim's assertions alone "may not constitute probable cause; the office may need to investigate further." *Nansaram v. City of New York*, No. 12-CV-5038 NGG RLM, 2015 WL 5518270, at *3 (E.D.N.Y. Sept. 17, 2015).  Further, evidence of a witness's unreliability that is known by the arresting officers may outweigh probable cause which would otherwise exist.  *Wilson v. Russo*, 212 F.3d 781, 790 (3d Cir. 2000).  Here, Officer Robley either knew about such a relationship from the protective order but did no further investigation or did an investigation and learned of Mr. Liu's background and that Mr. Liu was not a reliable source of information. Since 2011, a judge

declared Mr. Liu mentally unstable, and appointed a custodian guardian to represent him against his wish. This information was available to both officers. Also, just days before his arrest, Mr. Liu published a rambling blog post just a few days before coming to the precinct, signaling his mental instability. Either officer may have been aware of that post.

96.     For the forgoing reasons, the arrest was unlawful, and, therefore, Ms. Zeng will succeed on both the false arrest and malicious prosecution claim.

97.     The foregoing customs, policies, usages, practices, procedures and rules of the City and the NYPD were the direct and proximate cause of the constitutional violations suffered by Plaintiff as alleged herein.

98.     As a result of the foregoing customs, policies, usages, practices, procedures and rules of the City and the NYPD, Plaintiff was placed under arrest unlawfully and maliciously prosecuted.

99.     Defendants, collectively and individually, while acting under color of state law, were directly and actively involved in violating the constitutional rights of Plaintiff.

100.     Defendants, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate police officers, and were directly responsible for the violation of Plaintiff's constitutional rights.

101.     All of the foregoing acts by Defendants deprived Plaintiff of federally protected constitutional rights, particularly her Fourth and Fourteenth Amendment rights to be free from unreasonable search and seizure.

## II. Facts Concerning Municipal Liability

102.     All of the aforementioned acts of Defendants, their agents, servants, and employees, were carried out under the color of state law.

103. All of the aforementioned acts deprived Plaintiff of her rights, privileges and immunities guaranteed to citizens of the United States by the Fourth and Fourteenth Amendments to the Constitution of the United States of America and were therefore in violation of 42 U.S.C. § 1983.

104. The acts complained of were carried out by the Police Officers in their capacities as a police officer with all the actual and/or apparent authority attendant thereto.

105. The acts complained of were carried out by the aforementioned individual Police Officers in their capacitates as a police officer, pursuant to the customs, usages, practices, procedures, and rules of The City and the NYPD, all under the supervision of ranking officers of said department.

106. Defendants, collectively and individually, while acting under color of state law, engaged in conduct which constituted custom, usage, practice, procedure, or rule of respective municipality/authority, which is forbidden by the Constitution of the United States.

107. The Police Officers arrested, searched, and incarcerated Plaintiff, in the absence of any evidence of criminal wrongdoing, notwithstanding the Police Officers' knowledge that said search, arrest and incarceration would jeopardize Plaintiff's liberty, well-being, safety, and violate her constitutional rights, and there was no basis for it.

108. The acts complained of were carried out by the aforementioned Police Officers in their capacity as a police officer and official with all the actual and/or apparent authority attendant thereto.

109. The acts complained of were carried out by the aforementioned individual Defendants in their capacities as police officers and officials pursuant to the customs, policies,

15

usages, practices, procedures, and rules of the City and the NYPD, all under the supervision of ranking officers of said department.

110. Those customs, policies, patterns, and practices include, but are not limited to:

    i. failing to train officers in not to retaliate against citizens who make complaints;

    ii. failing to train officers in how to properly question a witness;

    iii. failing to train officers in how to investigate the claims on an informant;

    iv. failing to train officers in how to properly evaluate the credibility of an informant;

    v. requiring officers to make a predetermined number of arrests within a predetermined time frame;

    vi. requiring precincts to record a predetermined number of arrests within a predetermined time frame;

    vii. failing to take any measures to correct unconstitutional behavior when brought to the attention of supervisors and/or policy makers; and

    viii. failing to properly train police officers in the requirements of the United States Constitution.

111. The aforesaid customs, policies, usages, practices, procedures and rules of Defendant the City and the NYPD directly cause, inter alia, the following unconstitutional practices:

    ix. arresting individuals regardless of probable cause in order to inflate the officer's arrest statistics;

    x. arresting individuals regardless of probable cause in order to positively affect precinct-wide statistics;

    xi. falsifying evidence and testimony to support those arrests; and

    xii. falsifying evidence and testimony to cover up police misconduct.

112. In an Order dated November 30, 2009, in *Colon v. City of New York*, 09-CV-0008 (E.D.N.Y.) (Docket No. 34), the Hon. Jack B. Weinstein stated:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration -- through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department -- there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

113. Upon information, this policy was still in existence as of August 15, 2018.

114. Upon information and belief, on or about October 17, 2011, in a Police Officer Performance Objectives Operation Order (the "Operation Order"), NYPD Commissioner Kelly directed all commands that, "Department managers can and must set performance goals" relating to the "issuance of summons, the stopping and questioning of suspicious individuals, and the arrests of criminals."

115. Upon information and belief, that same Operation Order stated, "uniformed members… who do not demonstrate activities… or who fail to engage in proactive activities… will be evaluated accordingly and their assignments re-assessed."

116. This data-driven policing plan (the "Plan") has resulted in lawsuits filed by members of the NYPD in the United States District Court for the Southern District of New York, alleging that the NYPD requires officers to meet fixed numerical goals for arrests and court summonses each month.

*117.* In 2012, Police Officer Craig Matthews commenced *Matthews v. City of New York*, 12 CV 1354 (BSJ) in the Southern District of New York, alleging that his complaints that

the existing quota system was leading to unjustified stops and arrests, and thereby causing

damage to the department's relationship with the local community led to his termination. There

was little dispute that he made these complaints or that they were well founded. *See Matthews v.*

*City of New York*, 779 F.3d 167, 169 (2d Cir. 2015).

118.    That the Plan, or something substantially similar, is still in effect is also reflected

in a class action suit filed on December 10, 2015, *Edreweene Raymond v. The City of New*

*York,*15-CV-6885 (SDNY), by various police officers alleging that the NYPD still requires

officers to meet fixed numerical goals for arrests and court summonses each month. Officer

Edreweene Raymond has alleged in this lawsuit and in the media that the NYPD engaged in

unconstitutional, racist, discriminatory, and unlawful practices in attempting to achieve the goal

of meeting quotas, as opposed to combating crime. According to a New Yorker article published

August 27, 2018, which can be found online at https://www.newyorker.com/podcast/political-

scene/an-nypd-sergeant-blows-the-whistle-on-quotas, despite a 2010 statewide ban, officers are

forced to meet monthly quotas for arrests and summonses.

119.    Therefore, it is apparent that, through the litigation brought in the U.S. Courts for

New York, as well as the many cases filed in New York's State courts, thousands of civilian

shaves alleged that members of the NYPD have deliberately arrested them without probable

cause.

120.    According to an article by CBS New York, which can be found online

athttps://newyork.cbslocal.com/2016/02/23/nypd-crime-statistics-available-public/, Police

Commissioner William Bratton responded to these serious allegations of pushing quotas for

arrests dismissively. Thus, even if the Defendant the City of New York was not the architect of

the policies and routinized conduct causing these unlawful arrests, it was certainly on notice of

the practice, and by failing to take any meaningful corrective steps, has ratified, endorsed, or otherwise communicated its acceptance of this policy to the officers it employs.

121.    The Plan as kept in effect through the date of Plaintiff's arrest, even with Defendant The City's knowledge that county prosecutors were often not charging the individuals arrested, or otherwise not actively pursuing their prosecutions, or that there was insufficient evidence to justify the arrests and illegal searches, or that the arresting officers were seeking to bolster the arrests with false allegations, and that the prosecutors often had found in sufficient cause to justify the imposition of charges or continued prosecution if charges were filed. This is precisely the conduct that has given rise to the constitutional violations against Plaintiff alleged herein. She was arrested without any probable cause and the judge dismissed the charge against her.

122.    In a February 4, 2016, New York Times article, which can be found online at http://nyti.ms/1nPv0mO, the City proudly announced that the NYPD had "created a new 40-member legal unit that develops evidence that the Law Department can use to defend lawsuits against the police, and the [Law Department] hired about 30 lawyers to bolster its litigation teams and to try more cases in court."

123.    Accordingly, rather than take meaningful steps to reduce and eliminate such misconduct by its officers, the City and the NYPD have instead affirmatively announced are renewed commitment to defending such misconduct.

124.    Stated differently, The City's response to the litigation caused by misconduct on the part of the NYPD is, perplexingly, directed not at the deliberate, frequent, brazen constitutional violations giving rise to the litigation, but rather at defending such misconduct, thereby enabling officers to continue engaging in unconstitutional conduct without fear of being

sued or held accountable. In so doing, The City has dispensed altogether with any pretense that such misconduct is not sanctioned, ratified, or otherwise endorsed by The City and the NYPD's executive leaders and supervisory personnel.

125.     Based on the foregoing, The City has not only tolerated, but actively fostered a lawless atmosphere within the NYPD and that The City, at the bare minimum, has been on notice of, and remained deliberately indifferent to, the risk that the undue emphasis on arrest quotas, or minimum activity levels, particularly when coupled with a decidedly and deliberately in different level of supervision, would lead to the violation of individuals' constitutional rights in general, and the violation of Plaintiff's rights in particular.

126.     According to an article by New York Daily News, which can be found online at https://www.nydailynews.com/new-york/brooklyn/brooklyn-jury-socks-city-2-5m-death-trial-article-1.3002779, EXCLUSIVE: Mother of man shot dead by police wins $2.5M in wrongful death trial. The jury determined that Inspector Cell "intentionally discharged" his firearm at Ortanzso Bovell.

127.     According to an article by The City and Greenpointers, which can be found online at https://greenpointers.com/2021/04/22/cop-who-fatally-shot-young-black-man-to-head-north-brooklyn-detective-bureau/, Cop Who Fatally Shot Young Black Man to Head North Brooklyn Detective Bureau and https://www.thecity.nyc/2021/4/15/22386871/nypd-accidental-killers-rise-to-brooklyn-chief-questioned,NYPD 'Accidental' Killer Cop's Rise to Brooklyn Chief Questioned. The  death of Bovell was not the first time that Inspector Chell has been accused of using excessive force.

128.    According to The Legal Aid Society's new database CAPstat, which can be found online at https://www.capstat.nyc/officer/p17449/,there are many police misconduct and race discrimination lawsuits against Inspector John Chell.

129.    According to The Legal Aid Society's new database CAPstat, which can be found online at https://www.capstat.nyc/officer/p86580/ , there are many police misconduct lawsuits against Officer Christopher Robley.

130.    According to a data by BKReader and CAPstat, which can be  found online at https://www.bkreader.com/2019/03/13/east-new-yorks-75th-precinct-is-the-citys-most-sued-precinct/, East New York's 75th Precinct is the City's Most-Sued Precinct.  Since 2015, the precinct has faced 91 lawsuits and has paid $9.1 million in settlements.

131.    The foregoing customs, policies, usages, practices, procedures and rules of the City and the NYPD constitute a deliberate indifference to the safety, well-being and constitutional rights of Plaintiff.

132.    The foregoing customs, policies, usages, practices, procedures and rules of the City and the NYPD were the direct and proximate cause of the constitutional violations suffered by Plaintiff as alleged herein.

133.    The foregoing customs, policies, usages, practices, procedures and rules of the City and the NYPD were the moving force behind the constitutional violations suffered by Plaintiff as alleged herein.

134.    As a result of the foregoing customs, policies, usages, practices, procedures and rules of The City and the NYPD, Plaintiff was placed under arrest unlawfully.

135.    Defendants, collectively and individually, while acting under color of state law, were directly and actively involved in violating the constitutional rights of Plaintiff.

136.    Defendants, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate police officers, and were directly responsible for the violation of Plaintiff's constitutional rights.

137.    All of the foregoing acts by Defendants deprived Plaintiff of federally protected constitutional rights, particularly her Fourth and Fourteenth Amendment rights to be free from unreasonable search and seizure.

### CLAIMS FOR RELEIF
### FIRST CAUSE OF ACTION
### Pursuant to § 1983 (FALSE ARREST)

138.    Plaintiff here by realleges and incorporates each and every allegation contained in paragraphs 1 through 137 with the same force as though separately alleged herein.

139.    As a result of the Defendants' conduct, Plaintiff was subjected to illegal, improper and false arrest, taken into custody, and caused to be falsely imprisoned, detained, and confined without any probable cause, privilege, or consent.

140.    As a result of the foregoing, Plaintiff's liberty was restricted, Plaintiff was put in fear for her safety and the safety of her son, and she was falsely arrested without probable cause.

### SECOND CAUSE OF ACTION
### Pursuant to State Law (FALSE ARREST)

141.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 140 with the same force as though separately alleged herein.

142.    That at all times hereinafter mentioned, Defendant the City assumed responsibility supervision, and authority over the NYPD and, its agents, servants and employees, and is liable to plaintiffs for the acts complained of herein under the theories of vicarious liability and *respondent superior*.

143.    Plaintiff was detained and held under the imprisonment and control of the defendants under false pretenses.

144.    Due to the negligence of the Defendants, their servants, agents, employees, licensees, independent contractors and/or police officers while in the course and scope of their employment with the City, and acting under authority of the NYPD, falsely arrested and imprisoned the Plaintiff, without warrant, authority of law or probable cause therefore.

145.    That the acts and conduct on the part of the individual defendants constituting unlawful and unconstitutional conduct are: unlawfully and intentionally detaining and confining plaintiffs against their will and without their consent; unlawfully and intentionally detaining and confining plaintiffs without privilege, probable cause or valid legal process; fabricating evidence against the plaintiffs; unlawfully detaining and confining plaintiffs through the unlawful arrest of plaintiffs; unlawfully detaining and confining plaintiffs through the use of force; unlawfully arresting plaintiffs and placing plaintiffs in handcuffs without reasonable cause therefore, and committing such other acts resulting in the unlawful arrest and imprisonment of plaintiffs.

146.    That at all times herein after mentioned, said arrest, confinement and restraint of liberty was not otherwise privileged.

147.    That Plaintiff was conscious of the confinement.

148.    That as a direct, sole and proximate result of the false arrest and imprisonment, Plaintiff was caused to and did sustain humiliation and embarrassment, emotional and mental distress, moral and mental degradation, indignity and disgrace, injury to personal reputation, inconvenience, disturbance and disruption of life, legal expenses, and loss of personal income, as well as emotional and mental distress for the well-being of her.

149.    By the actions described above, the Police Officers and the City caused Plaintiff to be falsely arrested and/or falsely imprisoned without probable cause, without reasonable suspicion, illegally, without any proper claims, and without any right or authority to do so; and caused plaintiffs to suffer physical injuries. The acts and conduct of the defendants were the direct and proximate cause of injury and damage to the plaintiffs and violated his statutory and common law rights as guaranteed by the laws of the Constitution of the State of New York.

150.    As a result of the foregoing, Plaintiff was deprived of her liberty, suffered a loss of quality and/or enjoyment of life, economic injury, physical injury, psychological injury and emotional distress, great humiliation, costs and expenses, and was otherwise damaged and injured.

## THIRD CAUSE OF ACTION
### Pursuant to §1983 (EXCESSIVE FORCE)

151.    Paragraphs 1 through 150 are hereby realleged and incorporated by reference herein.

152.    That the incident that resulted from the intentional application of physical force by Defendants constituted a PTSD. That the use of excessive force including tight handcuffs in effectuating the arrest was unreasonable under the circumstances.

153.    That Defendants had no legal cause or reason to use excessive force in effectuating Ms. Zeng's arrest.

154.    That Defendants violated Ms. Zeng's Fourth and Fourteenth Amendment right to be free from unreasonable arrest when they used excessive force against her.

155.    That at the time of the arrest or while in custody, Ms. Zeng did not pose a threat to the safety of the arresting officers.

156.    That Ms. Zeng was not actively resisting arrest or attempting to evade arrest.

24

157.     That defendant CITY, through its officers, agents, and employees, unlawfully subjected Ms. Zeng to excessive force while effectuating her arrest.

158.     That Defendant's actions were grossly disproportionate to the need for action and were unreasonable under the circumstances.

159.     That by reason of Defendants acts and omissions, acting under color of state law and within the scope of his authority, in gross and wanton disregard of Ms. Zeng's rights, subjected Ms. Zeng's to excessive force while effectuating her arrest, in violation of her rights pursuant to the Fourth and Fourteenth Amendments of the United States Constitution.

160.     That Defendants had the opportunity to intervene, and failed to do so, to prevent violations of Ms. Zeng's civil rights, including but not limited to the right to be free from the application of excessive force.

161.     That upon information and belief, in 2012, Defendants and CITY had a policy or routine practice of using excessive force when effectuating arrests.

162.     That upon information and belief, it was the policy and/or custom of defendant CITY to inadequately train, supervise, discipline, and/or terminate their officers, staff, agents and employees, thereby failing to adequately discourage further constitutional violations on the part of their officers, staff, agents and employees.

163.     That as a result of the above described policies and customs, the officers, staff, agents and employees of defendant CITY, believed that their actions would not be properly monitored by supervisory officers and that misconduct would not be investigated or sanctioned, but would be tolerated.

164.     That the above described policies and customs demonstrate a deliberate indifference on the part of the policymakers of defendant CITY to the constitutional rights of arrestees and were the cause of the violations of Ms. Zeng's rights alleged herein.

165.     By reason of the foregoing, Ms. Zeng suffered physical injuries, mental injuries, emotional injuries, economic injury, trauma, humiliation, terror, damage to reputation, and other psychological injuries. All of said injuries may be permanent.

**FOURTH CAUSE OF ACTION**
**Pursuant to State Law (EXCESSIVE FORCE)**

166.     Paragraphs 1 through 165 are hereby realleged and incorporated by reference herein.

167.     That the incident that resulted from the intentional application of physical force by Defendants constituted a PTSD.

168.     That the use of excessive force including tight handcuffs in effectuating the arrest was unreasonable under the circumstances.

169.     That Defendants had no legal cause or reason to use excessive force in effectuating Ms. Zeng's arrest or after Ms. Zeng was arrested and in custody.

170.     That at the time of the arrest, Ms. Zeng did not pose a threat to the safety of the arresting officers.

171.     That Ms. Zeng was not actively resisting arrest or attempting to evade arrest.

172.     That Defendants actions were grossly disproportionate to the need for action and were unreasonable under the circumstances.

173.     That by reason of Defendants acts and omissions, Defendants, acting under color of state law and within the scope of their authority, in gross and wanton disregard of Ms. Zeng's

rights, subjected Ms. Zeng to excessive force while effectuating her arrest, in violation of the laws of the State of New York.

174.    That Defendants had the opportunity to intervene, and failed to do so, to prevent violations of Ms. Zeng's civil rights, including but not limited to the right to be free from the application of excessive force.

175.    By reason of the foregoing. Ms. Zeng suffered physical injuries, mental injuries, emotional injuries, economic injury, trauma, humiliation, terror, damage to reputation, and other psychological injuries. All of said injuries may be permanent.

### FIFTH CAUSE OF ACTION
### Pursuant to § 1983 (MALICIOUS PROSECUTION)

176.    Paragraphs 1 through 175 are hereby realleged and incorporated by reference herein.

177.    That Defendants with malicious intent, arrested Ms. Zeng and initiated criminal proceedings despite the knowledge that Ms. Zeng had committed no crime.

178.    That all charges against Ms. Zeng have been dismissed.

179.    That there was no probable cause for the arrests and criminal proceedings.

180.    That by reason of Defendants' acts and omissions, Defendants, acting under the color of state law and within the scope of their authority, in gross and wanton disregard of Ms. Zeng's rights, deprived Ms. Zeng of her liberty when they maliciously prosecuted her and subjected her to unlawful, illegal and excessive detentions, in violation of her rights pursuant to the Fourth and Fourteenth Amendments of the United States Constitution.

181.    That upon information and belief, Defendants had a policy and /or custom of maliciously prosecuting individuals despite the lack of probable cause. Thus, as a result of the

above described policies and customs, Ms. Zeng was maliciously prosecuted despite the fact that she had committed no violation of the law.

182.    That upon information and belief it was the policy and/or custom of defendant CITY to inadequately hire, train, supervise, discipline and/or terminate their officers, staff, agents and employees, thereby failing to adequately discourage further constitutional violations on the part of their officers, staff, agents, and employees.

183.    That as a result of the above described policies and customs, defendant CITY, its staff, agents and employees of defendant CITY believed that their actions would not be properly monitored by supervisory officers and that misconduct would not be investigated or sanctioned, but would be tolerated.

184.    That the above described policies and customs demonstrate a deliberate indifference on the part of the policy makers of defendant CITY to the constitutional rights of arrestees and were the cause of the violations of Ms. Zeng's rights alleged herein.

185.    That in so acting, defendant CITY abused its power and authority as policymaker of the NYPD under the color of State and / or local law.

186.    That upon information and belief, in 2012, defendant CTTY had a policy or routine practice of alleging facts against persons for the purpose of charging crimes they did not commit.

187.    That by reason of the foregoing, Ms. Zeng suffered physical and psychological injuries, traumatic stress, post-traumatic stress disorder, mental anguish, economic damages including legal expenses, damage to reputation, shame, humiliation, and indignity. All of said injuries may be permanent.

## SIXTH CAUSE OF ACTION
### Pursuant to State Law (MALICIOUS PROSECUTION)

188.    Paragraphs 1 through 187 are hereby realleged and incorporated by reference herein.

189.    That Defendants acted with malicious intent, arrested Ms. Zeng and initiated criminal proceedings despite the knowledge that Ms. Zeng had committed no crime.

190.    All charges against Ms. Zeng have been dismissed.

191.    That there was no probable cause for the arrests and criminal proceedings.

192.    That by reason of Defendants acts and omissions, Defendants, acting under the color of state law and within the scope of their authority, in gross and wanton disregard of Ms. Zeng 's rights, deprived Ms. Zeng of her liberty when they maliciously prosecuted her in violation of the Laws of the State of New York.

193.    That by reason of the foregoing, Ms. Zeng suffered physical and psychological injuries, traumatic stress, post-traumatic stress disorder, mental anguish, economic damages including legal expenses, damage to reputation, shame, humiliation, and indignity. All of said injuries may be permanent.

## SEVENTH CAUSE OF ACTION
### Pursuant to § 1983 (DENIAL OF FAIR TRIAL)

194.    Paragraphs 1 through 193 are hereby realleged and incorporated by reference herein.

195.    By fabricating evidence, defendants violated Ms. Zeng 's constitutional right to a fair trial.

196.    Defendants were aware or should have been aware of the falsity of the information used to prosecute plaintiff.

197.     As a result of the above constitutionally impermissible conduct, plaintiff was caused to suffer personal injuries, violation of civil rights, economic damages, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom and damage to her reputation and standing within her community.

## EIGHTH CAUSE OF ACTION
### Pursuant to § 1983 (ABUSE OF CRIMINAL PROCESS)

198.     Paragraphs 1 through 197 are hereby realleged and incorporated by reference herein.

199.     Defendants caused Ms. Zeng to be arraigned, constituting regularly issued legal process to compel performance or forbearance of some act.

200.     Defendants intended to do harm without excuse or justification.

201.     Defendants issued process against Ms. Zeng in order to obtain a collateral objective that is outside its legitimate ends.

202.     There was no probable cause for the criminal proceeding.

203.     By reason of Defendants' acts and omissions, Defendants, acting under the color of state law and within the scope of their authority, in gross and wanton disregard of Ms. Zeng's rights, deprived Ms. Zeng of her liberty by abusing criminal process, in violation of her rights pursuant to the Fourteenth Amendment of the United States Constitution.

204.     As a result of the above constitutionally impermissible conduct, Ms. Zeng was caused to suffer personal injuries, violation of civil rights, economic damages, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom and damage to her reputation and standing within her community.

## NINTH CAUSE OF ACTION
### Pursuant to § 1983 (DENIAL OF MEDICAL TREATMENT)

205.    Paragraphs 1 through 204 are hereby realleged and incorporated by reference herein.

206.    That the injuries Ms. Zeng suffered as a result of Defendants' excessive force amounted to a serious medical condition.

207.    That untreated, Ms. Zeng's injuries amounted to a substantial risk of harm.

208.    That Ms. Zeng requested medical treatment for her injuries.

209.    That Defendants refused to provide medical treatment.

210.    That the denial of medical care resulted in a substantial risk of harm to Ms. Zeng.

211.    That Defendants acted with reckless disregard for the substantial risk.

212.    That Defendants denied Ms. Zeng access to medical care because of a deliberate indifference to the medical need.

213.    That by reason of the foregoing, Ms. Zeng suffered physical and psychological injuries, traumatic stress, mental anguish, economic damages including attorney's fees, damage to reputation, shame, humiliation, and indignity. All of said injuries may be permanent.

<u>TENTH CAUSE OF ACTION</u>
**Pursuant to State Law (RESPONDEAT SUPERIOR)**

214.    Paragraphs 1 through 213 are hereby realleged and incorporated by reference herein.

215.    That Defendants were acting in furtherance of the duties owed to their employer, defendant CITY.

216.    That at all times Defendants were acting within the scope of their employment.

217.    That Defendant CITY was able to exercise control over Defendants' activities.

218.    That Defendant CITY is liable for Defendants actions under the doctrine of respondent superior. By reason of the foregoing, Ms. Zeng suffered physical injuries, mental

injuries, emotional injuries, economic injury, trauma, humiliation, terror, damage to reputation, and other psychological injuries. All of said injuries may be permanent.

## INJURY AND DAMAGES

As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer, physical pain, emotional pain, suffering, permanent disability, inconvenience, injury to her reputation, loss of enjoyment of life, loss of liberty and other non-pecuniary losses.

**WHEREFORE**, Plaintiff respectfully requests that judgment be entered:

1. Awarding Plaintiff compensatory damages in a full and fair sum to be determined by a jury;

2. Awarding Plaintiff punitive damages in an amount to be determined by a jury;

3. Awarding Plaintiff interest from January 31, 2018; and

4. Granting such other and further relief as to this Court deems proper.


Dated: New York, New York
      June 1, 2021

By:                                          
                    Xiamin Zeng *Plaintiff Pro se*
                    110 Columbia Street, Apt 1A
                    New York, NY 10002
                    E: amyzane77@gmail.com


To: <u>Via Email</u>
    Stephanie De Angelis Esq.,
    New York City Law Department
    100 Church Street, Room 3-202
    New York, NY 10007
    E: sdeangel@law.nyc.gov

IN THE MATTER OF THE CLAIM OF
**XIAMIN ZENG**
-against-
**THE CITY OF NEW YORK**

NYC COMPTROLLER
BUR. INFORMATION SYSTEMS
CENTRAL IMAGING FACILITY
RECEIVED

2018 DEC 20   A 9: 47

## TO:  THE COMPTROLLER OF THE CITY OF NEW YORK

　　　　PLEASE TAKE NOTICE that the undersigned claimant(s) hereby make(s) claim and demand against the City of New York as follows:

**1.  The name and post-office address of each claimant and claimants attorney is:**

XIAMIN XENG, 110 COLUMBIA Street, Apt 1A, New York, NY 10002
Wylie Stecklow, Wylie Stecklow PLLC, 217 Centre Street, 6th Floor, NY NY 10013

**2.  The nature of the claim:**

Violation of civil rights, false arrest, unlawful detention, physical injuries, personal injuries, mental and emotional injuries, fear, anguish, excessive force, assault, battery, deprivation of her child and negligence of and/or by THE CITY OF NEW YORK, and/or its agents, servants and/or employees or agents thereof, including but not limited to as-yet unknown POLICE OFFICERS.  IT IS KNOWN THAT NYPD MOS GARY DENEZZO, GEORGE TAVARES, DANIELLE FEBUS, JOHN CHELL, were involved with this unlawful detention and arrest.

**3.  The time when, the place where and the manner in which the claim arose:**

Commencing on or about January 31, 2018, the above identified officers of the NYPD falsely arrested the claimant after telling her to report to 112-25 Queens Boulevard and saying that her son was there. Once there, MOS FEBUS and ACS Worker  ADRIANZEN questioned the claimant about a previously filed federal lawsuit against ACS. After holding claimant for six hours, and refusing to let her see her son, she was transferred to the 75th Precinct. At the 75th Precinct, claimant was again questioned about her ACS lawsuit, including by Inspector John Chell. After approximately 20 hours of detention she was arraigned and released on her own recognizance.  The case was initially filed with felonies as the top count and required her to return to court 8 different times. On April 4, 2018, the felony counts were dismissed, and on December 3, 2018, the remaining counts were dismissed.  In the process, she was deprived of her son for a few days while she had to go to court and win custody back from ACS.  In negligently hiring, training and/or supervising the aforementioned officers, and in all other ways, the City of New York its agents servants, and employees were negligent, careless and reckless.  The City of New York is also responsible under the theory of respondeat superior.

**4.  The items of damages or injuries claimed are:**

Violation of civil rights, physical injuries, personal injuries, mental and emotional injuries, fear, anguish, excessive force, assault, battery, and negligence.  Among the physical injuries sustained were injuries to claimant's wrists and torso, and mental and emotional injuries.

**TOTAL AMOUNT CLAIMED:  $ 1,000,000  (ONE MILLION DOLLARS)  or an appropriate amount to be determined at a trial by jury.**

# Exhibit A

# 中国茉莉花行动部落

我们来自同一个家园，那里毒草丛生。
我们来自同一个部落，那里毒蛇横行。
我们播种茉莉，为了呼吸自由的芳香。
我们移植鲜花，为了拥抱春天的曙光。

**Blog Archive**

▶ 2019 (62)
▶ 2018 (66)
▼ 2017 (278)
  ▶ December 2017 (9)
  ▶ November 2017 (14)
  ▶ October 2017 (11)
  ▶ September 2017 (19)
  ▶ August 2017 (3)
  ▶ July 2017 (15)
  ▶ June 2017 (39)
  ▶ May 2017 (48)
  ▶ April 2017 (32)
  ▶ March 2017 (33)
  ▶ February 2017 (21)
  ▼ January 2017 (34)
    郭文贵爆大料：国安、公安、总参殊死搏杀
    川普政令：中共间谍曾霞敏一家三口面临被遣返
    贺岁谍战大片：面对坦克的自白
    Screenplay: Deposition to Tanks
    周立波和唐爽都是总参白手套，任务就是帮助总参洗白盗窃的技术
    川普就职当天，给中国一记闷棍：抓捕周立波，逼迫中国就范
    敦请川普总统彻查在美国潜伏的中国61398部队女间谍郭盈华、曾霞敏
    ZT：周立波在纽约法庭刚完成过堂程序
    ZT：周立波一起被抓的唐爽有多年？曾经惊动奥巴马！
    中共女谍遭遇美国法庭聆讯，面临重婚、屠婴、欺骗法庭等重罪指控

**Sunday, January 8, 2017**

Chinese Female Spy Dated with NYPD Police Officer and Trying to Kill Chinese Dissidents

http://jasmine-action.blogspot.com/2017/01/chinese-female-spy-dated-with-nypd.html

My name is Gang Liu, a well-known Chinese dissident. I used to be a student leader during Tiananmen pro-democratic movement in 1989. Due to my important role in Tiananmen movement, the Chinese Communist government listed me as the number 3rd of the most wanted student leaders right after the Tiananmen massacre in 1989.

On June 19th, 1989, I was arrested and sentenced to 6 years by the Chinese Communist government. I served 6 years in Chinese Communist prison, and I was persecuted by the Chinese prison police officers many times, including beaten, solitary confinement, shocked by high voltage electronic batons.

Thanks to Clinton's government, with the helps of Clinton's government, I escaped to the United States in April, 1996.

Right after I came to United States, I immediately started my American dream. I first enrolled in Harvard University to study English.

In September 1996, I enrolled in the Department of Computer Science, Columbia University.

In August 1998, I received Master degree in Computer Science and then joined Bell-Labs as a Scientist. During my tenure at Bell-Labs, I have several papers published and about a dozen of patents approved.

From 2003 to 2011, I worked in various Wall Street firms, including Morgan Stanley, Citigroup, Chase Morgan Bank, Bear Sterns, etc.

My American dream looks quite successful. However, the Chinese Communist government had never stopped to harass/chase/destroy me, even I became a citizen of the United States. Chinese Spy agencies sent Chinese spies to the United States to monitor me, harass me, now even try to kill me or kidnap me.

In 2007, Chinese government sent a female spy, Ms. Yinghua Guo, to approach me and then later to marry me through cheating. This is exactly a Honey Trap, which is a normal Chinese spy strategy.

In 2009 or 2010, I found that Yinghua Guo was an active Chinese Military officer and is a Chinese military spy hiding in the United States. I also found that Yinghua Guo originally belong to the 61398 Unit, General Staff Department of the Chinese People's Liberation Army (PLA), which is the notorious Chinese Military Hacker unit. Then, Yinghua Guo frequently threatened to kill me or destroy me through the judicial system of the United States. Mr. Yuhua Tang is one of the top head of the Chinese spy agency in charge of the North America region, and is a comrade or leader of Yinghua Guo. In 2010 and 2011, Mr. Yuhua Tang and Ms. Yinghua Guo frequently threatened me. They told

Chinese Female Spies
Tried to Attack/Kill
Presiden...

My Response to
American Lawyers
Hired by Chinese S...

An Open Letter to
President-Elect
Trump: Please di...

中共间谍雇佣美国众多律
师帮助中共探听我在中
国的"网络组织"

Chinese Spies are
Trying to Destroy my
Network (fa...

揭秘中国战斗机的开发研
制（机密）

《罗玉凤：求祝福，求鼓
励》-两天里得到320万
点击、20万捐款的烂
尾文

感谢凤姐转发凤姐文
章，否则我真不会深
挖"凤姐团队"

北京主流媒体集体讨
伐"凤姐团队"

彭丽媛派记者会公开审
讯"凤姐！《求祝福，
求鼓励》是他人捉刀代
笔！

评王路经文：罗玉凤代笔
了吗？

我揭露"凤凰网"，徐水良
割窃了"凤姐团队"

当今天下，贼灭多，多得
天下无贼！

中国第一夫人彭丽媛是我
的铁粉

凤凰网发声明：凤姐不是
总参特务！凤凰网退
出"凤姐团队"！

有请格格网友掰着手指头
算算我的话到底值多少
钱

凤姐罗玉凤是共军总参打
造的共军间谍！

我目前已经锁定一个在美
潜伏的共军女谍，有关
机构正在调查

An urgent notice to
Partners of King &
Spalding la...

Chinese Female Spy
Dated with NYPD
Police Officer ...

Second open letter to
Partners of King &
Spalding ...

An open letter to
Partners of King &
Spalding law ...

Open Letter to
President-elect
Trump: China starte...

致川普总统公开信：大批
中国军事间谍潜伏美
国，时刻准备发起对美
国的超限战！

me that they could easily destroy/kill me with or without their hands. Especially, they threatened me they could easily make me lost job and never find a job by cyber-attack my employers in the United States. I immediately reported to FBI and my ex-employer Morgan Stanley and alert them to protect Morgan Stanley's database from being attacked by Yinghuag Guo and her Chinese Military Comrades from Shanghai.

In May 2011, right after I gave alert to Morgan Stanley, its database was cyber-attacked from China based military hackers!

In June 2011, Citigroup another ex-employer of mine was also cyber-attacked from China based hackers!

The above mentioned cyber-attacks have the same patterns:

1. Mr. Yuhua Tang and Ms. Yinghua Guo threatened me to do cyber-attacks against my ex-employers, in order to make me lost jobs and could never find Wall-Street jobs.
2. Both Citigroup and Morgan Stanley were my ex-employers.
3. I alerted Morgan Stanley and FBI about the potential cyber-attacks from China based military hackers.
4. Both cyber-attacks happened right after the Yinghua Guo and Yuhua Tang's threatening Cyber-attacks against my ex-employers, and after I gave the alert to the potential targets of the Cyber-attacks.
5. Both cyber-attacks caused Citigroup and Morgan Stanley multi-billion dollars loss.
6. Right after the Cyber-attacks against my ex-employers, most of Wall Street firms listed me on the "black list" for recruiting process. All Wall-Street related firms and recruiters would not accept my applications for any jobs. This is exactly what Yinghua Guo and Mr. Yuhua Tang threatened me and reached their goals exactly!

It is no doubt that Ms. Yinghua Guo and Mr. Yuhua Tang were the initiators of the Cyber-Attacks against the Wall-Street firms! Ms. Yinghua Guo requested her Chinese Military spy agency and the Military hackers (Unit of 61398 of the PLA) to cyber-attack Citigroup and Morgan Stanley! By cyber-attacking my home-working computers, which were connected to Citigroup database and later to Morgan Stanley's database, Yinghua Guo collected the database information to attack databases of Citigroup's and Morgan Stanley's. Yinghua Guo provided these information to Unit 61398 of the PLA. Then Chinese Military Hackers launched the Cyber-attacks against several Wall-Street firms!

Morgan Stanley was Cyber-Attacked by Chinese military hackers. However, instead fighting back the Chinese Military hackers, Morgan Stanley fingered at me and requested me to keep silent about the hackers! To avoid such kind cyber-attacks from Chinese military hackers, Morgan Stanley fired me on July 8th, 2011! Morgan Stanley even fired some of my ex-colleagues in Morgan Stanley, just because they knew some details about the cyber-attacks!

In 2015, about four years later I exposed the Shanghai based China based military hackers, FBI listed 5 PLA military officers from Unit 61398 on the most-wanted list and responsible for some cyber-attacks against the United States firms. Some relevant evidences listed by FBI are simply copied from my blog articles!

My articles, which widely exposed Yinghua Guo and Yuhua Tang as Chinese top spies and responsible for the Cyber-attacks against the United States, made the Ms. Yinghua Guo and Mr. Yuhua Tang completely exposed and provided clues to FBI to do further investigation about the Cyber-attacks, as well as some Chinese Military spies hiding in the United States. In November, 2011, FBI arrested Mr. Yuhua Tang.

At the same time, my articles made the Chinese military spy agency very angry at me. Chinese spy agencies contacted me several times and threatened to kill me. They even invited me to go to Hong Kong or Vietnam to meet and talk to Chinese spy agents. I refused to meet them except they could come to the USA.

In the end of June, 2011, Chinese spy agency sent another Chinese female spy, Ms. Xiamin Zeng, to come to New York. Right after Ms. Xiamin Zeng came to New York, she approached me and cheated with faked documents. She pretended to be a Chinese dissident and had been arrested/detained over 20 times! She even showed me about 40 documents which shows she was frequently detained/released by the Chinese communist! Xiamin Zeng got my pathetic and love, and then she moved into my house in New Jersey. In May 2012, we had a new baby.

▶ 2016 (258)
▶ 2015 (219)
▶ 2014 (98)
▶ 2013 (147)
▶ 2012 (316)
▶ 2011 (257)

**Followers**

**Followers (181)** Next

   
  
  



Follow

**Contributors**

• Gang Liu
• 刘刚

However, once our son was born, starting from June of 2014, Xiamin Zeng took our son as hostage to threaten me to work for the Chinese spy agency! I believe that most of Americans would never believe that a mother could use her own son as hostage or weapon fight against the enemy of the Chinese Communist! However, if take a look at the Hollywood film "Mr. Butterfly", and if you know that movie is about Chinese spy story that is really happened in 1960's, you would understand that how evil the Chinese Communist spies are! Mr. Shi Peipu, a Chinese Communist male spy, pretended to be a lady and made an French diplomat fell in love with him. Then they married, and the male "wife" could give birth a new baby! After 18 years to live together as husband-and-wife, the French husband had never found his "wife" was a man until his "wife" confessed to the Judge at the court that his actual gender was Man and could never pregnant! These Chinese spies could create "babies" and used them as hostages and weapons to fight against their enemies or make some of the people to work for the Chinese spy agencies. Now, Xiamin Zeng just took my baby as hostage and weapon to destroy me or kill me, unless I collaborated with the Chinese spy agency!

I refused to work for the Chinese spy agencies as requested by Ms. Xiamin Zeng. Then Xiamin Zeng started the so called "unconstrained war" against me. In 2013, Ms. Xiamin Zeng threatened to kill me or destroy me. She clearly threatened me: "Believe it or not, I am a top Chinese spy sent by Mr. Shen Yuanxiong. I will continue to do what Yinghua Guo had done to you to make you dead in the Jail of the United States, or make you die on the street of New York!" Several times, Ms. Xiamin Zeng invited Mr. Zhao Yan, who is another top Chinese military spy in New York, to work together to kill me. Ms. Xiamin Zeng also asked Mr. Zhao Yan to introduce her to meet with Mr. Robert Bernstein, who is the founder of Human Rights Watch, and the co-founder of Human Rights First.

Ms. Xiamin Zeng frequently dated with some NYPD police officers from 109th precinct. Xiamin Zeng tried to espionage sensitive information from the police officers she dated with. For example, Xiamin Zeng used to ask those police officers to provide confidential activities, especially FBI activities regarding secret arrests collaborated with 109th precinct police officers, including the secret arrest/interrogation of Mr. Li Xinyi, who is a well-known Chinese businessman. Then Xiamin Zeng posted these sensitive information on blogs. Xiamin Zeng took advantage of those sensitive information to threaten the police officer to work for her and for the Chinese spy agency. If any of the corrupted police officers refused to collaborate with the Chinese spy agency, Xiamin Zeng would reported to FBI and made the police officers lose jobs or even threatened to send them to jail.

Since 2013, Xiamin Zeng, along with the police officers she dated with, made me arrested through false police report and false accusation again and again. They already made me arrested over ten times! Each time Xiamin Zeng just simply reported to police that I made phone calls to her, but without any phone records or any solid evidences, sometimes just simply accused me that I followed her, and the only evidences she provided to police was that she saw my car! However, I had no car at the time she claimed she saw my car! Obviously, Xiamin Zeng always lied to police officers, the police officers who took Xiamin Zeng's false report should easily find out Xiamin Zeng was a liar and shouldn't take such kind false police report. But with help of the police officers who dated with Chinese spies, Xiamin Zeng made arrested again and again!

Now, Xiamin Zeng made another false police report and try to make me arrested again. Last week, I exposed that Xiamin Zeng dated with police officers from 109th precinct. Xiamin Zeng and the police officers are trying their best to kill me now. Xiamin Zeng and the police officers she dated with reported to NYPD and Sheriff Department that I was a criminal escaped from prison, armed with weapons and are very dangerous. They not only made false police report, but also requested police officers to shot me whenever and wherever find me!



For the last few days, Deputy Sheriff R. Garcia hade come to my home several times and left me notice.

Mr. Garcia always went to my home at midnight and very quietly, just like a robber or a killer! I am afraid that Deputy Sheriff Garcia might received false report or might collaborated with the police officer who dated with Xiamin Zeng. There is no reasons for a Deputy Sheriff to come to my home at midnight and to knock my door very quietly!



The above document showed that my case was completely dismissed in September, 2016. However, the court record is continued to show that I should be in Jail and made me a fugitive!

The above picture is a snapshot of the bail receipt which my friend paid to the New York court on April 12, 2016. This case was completely dismissed in September 2016. The Judge and the court clerk told me that the $500 bail would be refunded to my friend within 4 weeks. However, my friend have contacted with the court several times, the court always told my friend that their records showed that Gang Liu was still in Jail! It looked like the database of the New York court or Jail had been cyber-attacked by the Chinese military hackers! They made me criminal records and made me an armed Fugitive and any police officers could arrest me or even shoot me whenever they find me!

My friend went to the New York Criminal court and asked for reasons. The court clerk told my friend that their records showed that the guy named Gang Liu was in jail now! However, my previous case was dismissed in September 2016! The court should refund the $500 bail to my friend in October 2016. But the court refused to refund the bail to my friend and claimed that I should be in Jail! How ridiculous of the Judicial system of the New York State! NYPD false accused me again and again. Once I released, they continued to list me as "Prisoners" and "criminals". I am afraid that the database of NYPD or the court of New York might be cyber-attacked by the Chinese Military hackers! The Chinese Military spy agencies tried to kill me by cyber-attack and list me as a fugitve and had criminal records!

How evil the Chinese Communist spies are!

There might exist evil activities that you could not imagine. but there are no evil activities that the Chinese Communist spies would not commit!

That is the Chinese communist spies! That is the Chinese female spy, Xiamin Zeng and Yinghua Guo are trying to do to me now, just like what they used to threaten to me: We can kill you with or without my hands! We can make you lost jobs and never find jobs! We can make killed in the Jail of the United States or on the street of New York!

My life is in danger now! I ask President-elect Donald Trump stand up to fight back the Chinese communist spies, to fight against the Chinese military hackers, and to make the United States to be a safe country, to protect out US citizens from being threatened, cyber-attacked, kidnapped, or even killed by the Chinese communist evils!

In order to protect myself, I posted this article on my blog and posted relevant Videos on Youtube. I also have my friends to keep some of relevant evidences. In case I was killed or kidnapped by Chinese spies or by some American police officers who worked for or cheated by the Chinese spies, I hope FBI would have some clue to investigate this case. I hope President-elect Donald Trump would be determined to fight against the Chinese Communist evils, to dig out and smoke out the Chinese spies and hackers!

God bless America!

Gang Liu
January 9, 2017

Posted by Gang Liu at 10:25 PM

No comments:

Post a Comment

```
Enter your comment...
```

Comment as:  erivera@theharn⏷    Sign out

Publish    Preview                                    ☐ Notify me

Links to this post

Create a Link

Newer Post                          Home                          Older Post

Subscribe to: Post Comments (Atom)

Simple theme. Theme images by gaffera. Powered by Blogger.

# Exhibit B

| **ACTIVATE INVESTIGATION CARD** | | **Crime/Condition**<br>MISCELLANEOUS PENAL LAW | **Command**<br>075-75TH PRECINCT<br>**Date of This Report**<br>01/14/2017 |
|---|---|---|---|
| **Date of UF61**<br>01/13/2017 | **Complaint No.**<br>2017-075-00627 | **Date Case Assigned**<br>01/14/2017 | **Case No.**<br>2017 - 188 | **Unit Reporting**<br>SQUAD | **Follow-Up No.**<br>7 |

| **Topic/Subject**<br>(ACTIVATE INVESTIGATION CARD) ACTIVATE INVESTIGATION CARD | **Activity Date**<br>01/14/2017 | **Activity Time**<br>09:00 |
|---|---|---|

**Details**

**Summary of Investigation:**
1. On January 14, 2017, at approximately 0900 hours I activated an I-Card on suspect Zeng, Xiamin 09/09/1981 (NYSID# 12493265Z)

**iCard**

| **Control No.** | | **IDS No.**<br>I2017001795 | | | | | |
|---|---|---|---|---|---|---|---|
| **Last Name**<br>Zeng | **First Name**<br>Xiamin | | **M.I.** | **Aliases/Nicknames** | | **NYSID No.**<br>12493265Z | |

| **Last known address (Street, Apt, State, Zip)**<br>NYC 90-31 51 AVENUE Apt#2FL QUEENS, NY 11373 | | | | | **Pct.**<br>110 | | |
|---|---|---|---|---|---|---|---|
| **Sex**<br>FEMALE | **Race**<br>ASIAN/PAC.ISL | **Date of Birth**<br>09/09/1981 | **Social Security No.** | **Height**<br>5-4 | **Weight**<br>140 | **Hair Color**<br>BROWN | **Eye Color**<br>BROWN |

| **Sought As**<br>PERPETRATOR - PROBABLE CAUSE TO ARREST | **Precautions to be Observed** | **Other** |
|---|---|---|
| **Domestic Violence?**<br>Yes | **Misd**<br>No | **Felony**<br>Yes |

**EDP/Psych History (If Yes Explain in Specific Instructions for Officers):**

| **Law Title**<br>PL | **Law Section**<br>PL 215 | BRIBING A WITNESS | **Law Code/Description**<br>PL 215.51 | F | E | 1 |
|---|---|---|
| **Attempt**<br>NO | **Type**<br>F | **Class**<br>E | **Count**<br>1 |

**Additional Information Regarding Subject (e.g. Friends, Relatives, Phone Numbers, Additional Addresses)**
N/A

**Additional Descriptive Information (Tattoos, Piercings, Facial Hair, Eyewear)**
N/A

**Specific Instructions For Apprehending Officers:**
N/A

**Required Computer Checks**

| **DALL Checked**<br>NO | **Active Warrant**<br>NO | **Notified TaxId** | **Name** | **Rank** | **Cmd** |
|---|---|---|---|---|---|
| **EJustice Checked**<br>NO | **Active Warrant**<br>NO | **Notified TaxId** | **Name** | **Rank** | **Cmd** |
| **NYSID Checked**<br>YES | **Multiple Active NYSIDs**<br>NO | **Notified TaxId** | **Name** | **Rank** | **Cmd** |

DEF00228

| CRIMS Checked YES | Scheduled Court Date NO | Date of Next Court Appearance | Court Location | Court Part | Notified TaxId | Name | Rank | Cmd |
|---|---|---|---|---|---|---|---|---|

**Command Phone Number**

<br>

| Reporting Officer: | Rank DT3 | Name CHRISTOPHE ROBLEY | | Tax Reg. No. 934119 | Command 296-75 DET SQUAD |
|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing - | Date Reviewed 01/14/2017 | Date of Next Review | Name JORGE TORRES | Supv. Tax No. 924564 |

DEF00229

DEF00230

# Exhibit C



**Febus Det**
+19178649449

Wednesday, January 31, 2018

Hello this is Det Febus your son Longman is in our care at 112-25 Queens Boulevard Forest Hills, NY please contact 718-261-3179

11:07 AM

Enter message

SEND